UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re											Chapter 13
Timothy Shawn McCormick,							Case No.: 06-23358-svk
					Debtor.

MEMORANDUM DECISION ON CONFIRMATION OF THE PLAN

The issue in this chapter 13 case is whether interest must be paid on a "910 claim" and if so, how much. Timothy McCormick (the "Debtor") filed a chapter 13 petition on June 22, 2006, and his case is governed by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). Among BAPCPA's most litigated provisions is the unnumbered "hanging paragraph" added to Bankruptcy Code § 1325(a), which provides in pertinent part:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding [sic] the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle . . . acquired for the personal use of the debtor.

The Debtor financed the purchase of a 2000 Hyundai Elantra with AmeriCredit Financial Services, Inc. ("AmeriCredit") within 910 days of his bankruptcy petition, and there is no dispute that AmeriCredit's claim is a "910 claim" as defined by the hanging paragraph. The Debtor's second amended plan proposed to pay AmeriCredit's 910 claim in full with interest at 4.89% which the Debtor says was the "T-Note" rate in effect on the petition date. AmeriCredit objected; the contract between the parties calls for 18% interest, and the "prime plus" rate suggested by AmeriCredit is 10.25%.

In his brief, the Debtor advanced an alternative argument, that no interest at all should be paid on AmeriCredit's claim. This contention is based on three theories: first, application of the hanging paragraph means that AmeriCredit does not have an allowed secured claim. This interpretation has been adopted by a small minority of courts, starting with *In re Carver*, 338 B.R. 521 (Bankr. S.D. Ga. 2006). Second, the Debtor states that no interest is due on AmeriCredit's claim because there is no risk to AmeriCredit: the monthly plan payments exceed the depreciation on the vehicle, and accordingly, AmeriCredit's position is actually improving each month that a payment is made on the claim. Finally, the Debtor argues that full payment of the claim without interest results in an "inherent interest rate" which compensates AmeriCredit for its risks and the time-value of its money.

In its brief, AmeriCredit cited the "long line of cases" that have rejected *Carver's* analysis of the hanging paragraph. To support its contention that the claim must receive interest at the prime rate plus a risk factor of 1.5% to 2%, AmeriCredit relies on *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), a pre-BAPCPA case in which the Supreme Court analyzed the interest rate payable on a secured creditor's claim under § 1325(a)(5)(B)(ii).

The court held an evidentiary hearing at which AmeriCredit introduced evidence of the prime rate and the failure rate of chapter 13 cases in this District, and the Debtor offered the testimony of an expert that the Debtor's plan payments (even without interest) provide AmeriCredit with an effective interest rate of over 20%, albeit based upon the value of the vehicle, not the full amount of the unpaid claim. The chapter 13 trustee argued that a vintage Supreme Court case, *Wright v. Union Central Life Insurance Co.*, 311 U.S. 273 (1940), addressing an ambiguous provision for secured creditors under a prior bankruptcy law, provides the answer. The court took the issue under advisement, and this Memorandum Decision constitutes the court's findings of fact and conclusions of law.

Section 1322(b)(2) of the Bankruptcy Code expressly authorizes a chapter 13 plan to modify the rights of any creditor whose claim is secured by an interest in personal property. The authority is not unfettered: § 1325(a)(5) provides three options for dealing with the holders of "allowed secured claims." First, the debtor and creditor can agree on mutually acceptable treatment. Second, the debtor can surrender the collateral to the creditor. Finally, the debtor can propose to retain the collateral, in which case § 1325(a)(5)(B) applies. That section provides in relevant part:

> (a) Except as provided in subsection (b), the court shall confirm a plan if – . . .
> (5) with respect to each allowed secured claim provided for by the
> plan– . . .
> (B) . . .
> (ii) the value, as of the effective date of the plan, of property to be distributed
> under the plan on account of such claim is not less than the allowed amount of
> such claim. . . .

The first issue is whether AmeriCredit has an "allowed secured claim." The Debtor argues that application of the hanging paragraph (which subtracts § 506 from the equation) means that a 910 creditor does not have an allowed secured claim. Section 506(a)(1) states:

> An allowed claim of a creditor secured by a lien on property in
> which the estate has an interest, or that is subject to setoff under
> section 553 of this title, is a secured claim to the extent of the
> value of such creditor's interest in the estate's interest in such
> property, or to the extent of the amount subject to setoff, as the
> case may be, and is an unsecured claim to the extent that the value
> of such creditor's interest or the amount so subject to setoff is less
> than the amount of such allowed claim.

As § 506 does not apply to 910 claims, the Debtor argues that the holders of 910 claims do not have allowed secured claims. The Debtor relies on *Carver*, and two more courts also have concluded that a 910 claim is not an allowed secured claim entitled to interest.[1] *In re Taranto*, 344 B.R. 857 (Bankr. N.D. Ohio 2006); *In re Wampler*, 345 B.R. 730 (Bankr. D. Kan. 2006). As noted by AmeriCredit, the vast majority of courts have gone the other way.

Although *Carver* and its progeny are carefully reasoned, this court sides with the majority. The hanging paragraph itself expressly refers to § 1325(a)(5), dealing with allowed secured claims. Thus 910 claims must be a subset of allowed secured claims, even though 910 claims cannot be bifurcated under § 506 like other secured claims. This court recently analyzed Bankruptcy Code § 1325(a)(5)(C) in *In re Turkowitch*, 2006 Bankr. LEXIS 3152 (Bankr. E.D. Wis. Nov. 16, 2006). In *Turkowitch*, discussing the effect of § 506 pre- and post-BAPCPA, this court stated:

> Pre-BAPCPA, after bifurcation of the claim, to comply with § 1325(a)(5)(B), the secured portion was paid in full (with interest in order to achieve the value of the allowed secured claim as of the effective date of the plan), and the unsecured portion was relegated to unsecured claim status. By removing § 506 from the mix, BAPCPA's hanging paragraph has drastically changed this treatment. It is clear now -- post-BAPCPA – that the bifurcation function of § 506 cannot be triggered by § 1325(a)(5)(B), since the hanging paragraph has simply subtracted § 506 from the equation. Therefore, if a debtor retains a 910-car and proposes to pay the claim through the plan, the debtor must pay "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim [in an amount] not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5)(B)(ii). In other words, if § 506 does not apply to reduce the allowed amount of the claim to the value of the collateral, the entire claim is a secured claim, and the debtor must pay that entire amount to satisfy § 1325(a)(5)(B).

2006 Bankr LEXIS 3152 at *10. *See also In re Trejos*, 2006 Bankr. LEXIS 2788 (Bankr. D. Nev. Sept. 25, 2006) (§ 506 does not contain the Bankruptcy Code's exclusive definition of "allowed secured claim"). Cases like *Trejos* and *Turkowitch* employ the clearest and most logical reading of the hanging paragraph, treating 910 claims as a subset of allowed secured claims that cannot be bifurcated.

---

[1] Judge Walker, who authored the opinion in *Carver,* has revisited the issue with the same result in *In re Green*, 348 B.R. 601 (Bankr. M.D. Ga. 2006).

Since AmeriCredit is the holder of an allowed secured claim, the next issue is whether a plan proposing to pay the claim in full, but without any post-petition interest, complies with § 1325(a)(5)(B)(ii). Recall that the Debtor's plan proposes to pay AmeriCredit in monthly installments, and those installments will equal the full amount of the principal and interest due and owing to AmeriCredit on the date of the Debtor's petition. In *Till*, the Supreme Court contrasted such payments over time to the situation in which the debtor proposes to pay a lump sum to the holder of an allowed secured claim: "A debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment." 541 U.S. at 474. Accordingly, to achieve the "value as of the effective date of the plan," a creditor must receive interest on its allowed secured claim. In determining an interest rate, the plurality in *Till* stated the goal is to objectively ensure that the debtor's interest payments will adequately compensate similarly situated secured creditors for the "time value of their money and the risk of default." *Id.* at 477. The Court also was concerned with choosing an interest rate that would not impose a significant evidentiary burden on debtors. *Id*.

The Supreme Court chose a formula based on the prime rate starting with "ordinary lending practices," and the Debtor seizes on those words to suggest that such practices would suggest that the value of the collateral is the starting point for calculating the "inherent" interest rate on AmeriCredit's claim. The Debtor's expert testified that based on a collateral value of $4,612.50 and payments of $5,854.12 (the total amount of AmeriCredit's claim) over the 28 months projected to pay AmeriCredit in the plan, the inherent interest rate is 20.692%. The Debtor also argues that paying AmeriCredit in full without interest results in AmeriCredit's realization of a "statutory default risk premium," which is the difference between the value of the vehicle and the full amount of the claim.

The problem with this analysis is that it is rooted in the value of AmeriCredit's collateral, which is exactly the element that the hanging paragraph deleted.[2] The 910 creditor is entitled to the present value of its allowed claim (the full amount due and owing on the petition date) not the value of the underlying collateral. By removing the application of § 506 to § 1325(a)(5)(B), Congress prohibited exactly what the Debtor proposes: reducing AmeriCredit's claim to the value of the vehicle and calculating the interest based on that value. The Debtor's expert did not testify that consumer lenders start with the value of the collateral in calculating interest for a

---

[2] The trustee's reliance on *Wright v. Union Central* suffers the same flaw. The Supreme Court construed a 1933 Amendment to the Bankruptcy Act allowing a farmer to redeem collateral at its appraised value. 311 U.S. at 278. "Safeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the property. There is no constitutional claim of the creditor to more than that." *Id.* (citations omitted). Neither the trustee nor the Debtor cited any authority preventing Congress from providing better than the minimum constitutional protection to secured creditors, as was the clear intent of the hanging paragraph.

loan. Rather, interest is calculated based on the principal amount of the loan. Similarly here, in order to achieve the present value of the allowed amount of the secured claim that is to be paid over time, it is not appropriate to start the analysis with less than the full amount of the claim. *See, e.g., In re Fleming*, 339 B.R. 716, 722 (Bankr. E.D. Mo. 2006) (hanging paragraph prevents bifurcation of claim; balance due at filing must be paid with interest calculated under *Till*).

Moreover, accepting the Debtor's argument would render meaningless that portion of § 1325(a)(5)(B) that requires the value of the claim to be paid "as of the effective date of the plan." There would be no distinction between the value of the property received by a creditor whose 910 claim was paid in full on the effective date and one whose claim was paid over the term of a 36 or 60 month plan. This interpretation would violate a "cardinal principle of statutory construction . . . to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section . . . ." *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (internal citations and quotations omitted). Honoring the requirement of § 1325(a)(5)(B)(ii), that AmeriCredit's distributions must equal its allowed claim "as of the effective date of the plan," mandates that some interest must be paid on AmeriCredit's 910 claim if the claim is to be paid in installments under the plan.

The rate of interest is subject to dispute. The Debtor proposes that the T-Note rate be used, since AmeriCredit is already receiving a significant "default risk premium" by having its claim paid in full. Moreover, the Debtor's expert testified that the three-year T-Note rate is appropriate since it reflects no risk for default, but compensates the holder for inflation. AmeriCredit contends that under *Till*, the prime rate is the appropriate starting point, and suggests that 1.5% to 2% should be added due to the risk that the Debtor will default on his plan. To demonstrate this risk, AmeriCredit introduced an e-mail from a Senior Economist at the Bankruptcy Judges Division at the Administrative Office of the United States Courts. The e-mail suggests that for the 12-month period ending June 30, 2000, 43.9% of the chapter 13 cases in this district ended in a chapter 13 discharge, and an additional 2.7% were still pending after 72 months. Some 18% of the cases that ended in that period had converted to chapter 7; presumably the balance of the cases were dismissed. Of course, it is much too soon to determine the success rate of cases under BAPCPA, and AmeriCredit's statistics do little to demonstrate the risk that this particular Debtor will default on his plan. In fact, this Debtor appears to be relatively risk free: he has a long-term steady job, is fairly young and healthy, and does not have a mortgage to address in his chapter 13 plan. In the court's experience, a chapter 13 debtor that attempts to cure a mortgage default, especially an adjustable rate mortgage, is far more likely to default than a debtor under these circumstances.

There is no legal precedent favoring any rate other than the prime rate as the starting point for the interest calculation. In fact, in *Till*, the Supreme Court suggested that the prime rate is the only starting point to use. 541 U.S. at 478-79 ("[T]he approach begins by looking to the national prime rate . . ."). Common sense also dictates that the prime rate is a better choice than the T-Note rate. Although the risk of the Debtor's default may be low, it is certainly higher than the risk of default by the federal government, with its ability to print money. The prime rate is

Case 06-23358-svk    Doc 33    Filed 12/05/06    Page 5 of 6

"the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." *Id.* at 479. Accordingly, the starting point for interest on the allowed secured claim is the prime rate.

The prime rate is to be adjusted for the greater risk that chapter 13 debtors may pose than solvent commercial borrowers, and AmeriCredit bears the burden of proof on the amount of the adjustment: "The court must therefore hold a hearing at which the debtor and any creditors may present evidence about the appropriate risk adjustment . . . . [T]he evidentiary burden [is] squarely on the creditors, who are likely to have readier access to . . . information." *Id.* AmeriCredit's only evidence was the e-mail concerning the completion rate for chapter 13 cases in this district in the 12-month period ending in June 2000. This evidence fails to meet the burden of proof. The Debtor's credible and compelling testimony suggested that he will be able to complete his payments to AmeriCredit under the plan. In *Till*, the Supreme Court noted that if a court could be sure that the debtor would not default on the plan, the prime rate, without adjustment, would be adequate compensation for the secured creditor. *Id.* at n.18. Given the Debtor's age, health, employment and income history, the nature and amount of his obligations under the plan, and AmeriCredit's failure to submit any evidence suggesting that this Debtor is likely to default on the plan, no risk adjustment is warranted. Accordingly, no interest should be added to the prime rate to compensate AmeriCredit for its risk in this case.

For the foregoing reasons, AmeriCredit's objection to confirmation is sustained; but the Debtor shall have 30 days from the date of this Order to modify his plan to pay AmeriCredit's claim in full, with interest at the prime rate in effect on the date of the petition.

Dated: December 5, 2006

By the Court:

Susan V. Kelley
U.S. Bankruptcy Judge